UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARLON F. BEASON,<br><br>                              Petitioner,<br><br>v.<br><br>DANNY SAMUEL, *Warden*,<br><br>                              Respondent. | Case No.:  21cv2052-GPC (MSB)<br><br>**REPORT AND RECOMMENDATION FOR ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

        This Report and Recommendation is submitted to the United States District Judge Gonzalo P. Curiel pursuant to 28 U.S.C. § 636(b) and Civil Local Rules 72.1(d) and HC.2 of the United States District Court for the Southern District of California.  Petitioner, Marlon F. Beason, is a state prisoner who commenced these habeas corpus proceedings on December 8, 2021, pursuant to 28 U.S.C. § 2254.  (Petition, ECF No. 1.)  He filed a First Amended Petition ("Amended Petition") on January 14, 2022.  (Amended Petition, ECF No. 5.)  Petitioner challenges the constitutionality of his state court conviction for armed robbery.  (See ECF No. 5 at 6.)  Respondent answered on June 8, 2022.  (Answer, ECF No. 11.)  Petitioner filed a Reply on July 6, 2022.  (Reply, ECF No. 12.)

This Court has considered the Amended Petition, Answer, Reply, and all supporting documents filed by the parties.  For the reasons set forth below, this Court **RECOMMENDS** that Petitioner's Petition for Writ of Habeas Corpus be **DENIED**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The following facts are taken from the California Court of Appeal's opinion in People v. Marlon Beason, Appeal No. D074452.  (See ECF No. 11-8.)  This Court presumes the state court's factual determinations are correct, absent clear and convincing evidence to the contrary.  See 28 U.S.C. § 2254(e)(1); Miller-El v. Cockrell, 537 U.S. 322, 340 (2003); see also Parke v. Raley, 506 U.S. 20, 35 (1992) (findings of historical fact, including inferences properly drawn from such facts, are entitled to statutory presumption of correctness).

Around 5:00 a.m. on October 14, 2017, T.T. opened the doors to the gas station convenience store where he worked.  Shortly after opening the store, T.T. was stocking the cooler when he heard the door open and saw someone walk in.  He turned back to the cooler, then realized the person was standing near him, so he turned around.  The customer was holding a red gas can in one hand, and a green rag or towel wrapped in his other hand.  When the customer spoke, T.T. did not hear the man, and the man then lifted the towel off his hand to display a gun he was holding and repeated himself: "Give me the money."  As T.T. moved toward the register, the perpetrator told him to hurry up.  After T.T. gave the robber cash from the register, the robber left with the money, the gun, and the cash.

T.T. called 911, and he offered the operator a description of the robber as a Black male, about six feet two inches tall, between ages 30 and 40 years old, with a big, muscular build, wearing a black jacket and possibly black pants, carrying a gas can and a black gun, possibly a .9 millimeter.  The robber's face was covered by a mask, which came down to his chin.  The robber dropped the small towel that had covered the gun when he ran out of the store.

At trial, T.T. testified he believed the robber had been waiting to enter the store because T.T. looked before opening the store, and he did not see any lights or vehicles parked in front of the store's doors, and the

robber entered so soon after it opened.  He also explained that he could only see part of the robber's face, his upper cheekbone and eye area, but he did not see any tattoos on the robber's neck or notice the robber's eye color.

When police responded to the scene, they collected video surveillance from several cameras, as well as the bright green towel that had been wrapped around the robber's hand and which the robber left behind.  The towel was tested for DNA, and there was a 91 percent contributor and a nine percent contributor.  The information was entered into CODIS, which returned a possible suspect whose DNA matched the 91 percent contributor.  When the criminologist compared the DNA from the 91 percent contributor to Beason, he found "it [was] 7.78 times 10 to the 27th times" more likely to match Beason than not—"that would be 778 with 25 zeros," or an "octillion."

On December 19, 2017, police searched Beason's Yukon as part of a coordinated traffic stop to arrest him.  From the vehicle, police collected a black drawstring-like bag or satchel with a Harley Davidson motorcycle logo on the outside of it.  Detective Javier Padilla recovered a handgun from inside the bag and removed a loaded magazine from the weapon.  Once he removed the weapon to render it safe, he left the bag on the seat of the vehicle and left it for another police officer to collect and photograph.  There was a bright green towel in the bag with the gun.

Police also recovered from the vehicle a red gas can, which they later determined was not an exact match to the gas can used during the robbery.  They also found a pair of binoculars, which were folded small enough to fit in the palm of a person's hand, and a black hoodie sweatshirt.

Police next searched Beason's residence.  There, they saw green towels similar to the one recovered at the crime scene, but they did not collect them because police were searching for clothing and firearms.  Police collected black pants similar to those the robbery suspect wore in the video surveillance, and they found a backpack that contained a magazine and ammunition for a .40 caliber weapon, the same style of gun recovered from Beason's vehicle.  Police looked for low-quarter dark or gray shoes, with a rubber covering over the toe, like ones the robbery suspect wore, and they recovered a similar pair from Beason's residence. They also recovered motorcycle gloves, but those did not match the

3

motorcycle gloves worn by the robber in the video surveillance.

Detective Padilla interacted with Beason on December 19, 2017.  At trial, he described Beason as six foot two inches to six foot four inches, between 250 and 290 pounds, and as having a "large build, a large frame," "a big person in height," "not a thin person," but also not fat, more "muscular, thick build."  He acknowledged that Beason has a tattoo on his neck of three stars, with the largest one closer to the ear, then descending in size as they go down the neck.  He told the jury he watched the store surveillance video 20 to 40 times.  He did not see any distinct tattoos on the suspect in the video surveillance.  He explained that sometimes surveillance video does not capture something as distinct as a tattoo, just like the videos do not always capture the exact letters on license plates.  He pointed out in a still from the video that there was something in the area of the neck.

Detective Padilla testified he had an opportunity to watch Beason walk during their interactions.  He explained that when the suspect in the robbery video took footsteps forward, his knees rotated inward a bit, and he noticed Beason did the same thing when Beason walked.  He compared Beason's physical appearance to the physical characteristics of the person on video.  He also noticed that the robbery suspect's profile and his image running from the store showed the hip and buttocks area rising a bit, which was also similar to Beason.  He pointed this out on the video.

An investigative technician for the San Diego County District Attorney testified about the still shots he created from the surveillance video.  He said the video had low pixilation, so details were not always visible or readable.  He explained that he selected images that best displayed the robber's left neck area, but even after using extreme settings, nothing noteworthy popped out to him in the perpetrator's neck area.

(ECF No. 11-8 at 2–5.)

On January 10, 2018, the prosecutor charged Petitioner with four felony counts: robbery (count 1) with a gun use enhancement, possession of two different firearms by a previously convicted felon (counts 2 and 3), and possession of ammunition by a person prohibited from possessing a firearm (count 4).  (ECF No. 11-3 at 7–8.)  The prosecutor

filed an Amended Information on June 4, 2018, that alleged three prison priors, two serious felony priors, and two strike priors.  (Id. at 13-15.)  The same day, Petitioner pled guilty to counts 2, 3, and 4 and waived his right to jury trial on prior allegations, which were bifurcated from the trial of count one.  (ECF No. 11-4 at 11–18.)  On June 12, 2018, a jury found Petitioner guilty of robbery but found the allegation regarding the gun use not true.  (ECF No. 11-3 at 226; ECF No. 11-4 at 602-03.)  The trial court then found the prior allegations true.  (ECF No. 11-4 at 621-30.)  The court then imposed a sentence of 16 years plus 25 years to life.  (ECF No. 11-3 at 360-61.)

On September 18, 2019, Petitioner appealed, arguing the court prejudicially erred by admitting irrelevant evidence and allowing a law enforcement officer to present improper lay testimony.  (ECF No. 11-5 at 18–35.)  In addition, Petitioner argued the trial errors resulted in an unfair trial that was a denial of Petitioner's Fifth and Fourteenth Amendment rights.  (ECF No. 11-5 at 35–37.)  On July 1, 2020, the California Court of Appeal issued a written opinion rejecting Petitioner's claims and affirmed the judgment. (ECF No. 11-8.)  Petitioner subsequently filed a petition for review in the California Supreme Court, which denied the petition without comment or citation to authority on September 9, 2020.  (See ECF No. 5 at 39.)

On August 20, 2021, Petitioner filed a Petition for Writ of Habeas Corpus in the Superior Court of San Diego, arguing the state court decision was objectively unreasonable because he had suffered from ineffective assistance of counsel ("IAC"), and that he was actually innocent, as shown by new evidence.  (ECF No. 11-10.)  The San Diego Superior Court denied the Petition on September 2, 2021.  (ECF No. 11-11.) Petitioner filed another habeas raising the same claims before the California Court of Appeal on October 26, 2021, (ECF No. 11-12), which the Court of Appeal denied on November 2, 2021, (ECF No. 11-14).  Petitioner then filed a petition for review with the California Supreme Court on November 9, 2021, which that court denied on December 15, 2021.  (ECF No. 11-15.)

1       On December 8, 2021, while awaiting a ruling from the California Supreme Court,

2 Petitioner filed a protective habeas corpus petition and a Stay and Abey Motion in this

3 Court.  (See ECF No. 1 and ECF No. 2.)  After receiving the state supreme court's denial,

4 Petitioner filed a First Amended Petition ("Amended Petition") on January 14, 2022,

5 raising the evidentiary claims he presented in his state appeal and his state habeas

6 claims.  (ECF No. 5.)

7                     **II.  SCOPE OF REVIEW**

8       Title 28 of the United States Code, § 2254(a) sets forth the following scope of

9 review for federal habeas corpus claims:

10       The Supreme Court, a Justice thereof, a circuit judge, or a district court shall

11       entertain an application for a writ of habeas corpus in behalf of a person in
       custody pursuant to the judgment of a State court only on the ground that

12       he is in custody in violation of the Constitution or laws or treaties of the

13       United States.

14 28 U.S.C.A. § 2254(a).

15       The instant Amended Petition was filed after April 24, 1996, and therefore is

16 subject to the Anti-terrorism and Effective Death Penalty Act ("AEDPA") of 1996, Pub.L.

17 No. 104-132, 110 Stat. 1214.  Under 28 U.S.C.A. § 2254(d), as amended by AEDPA:

18       (d) An application for a writ of habeas corpus on behalf of a person in

19       custody pursuant to the judgment of a State court shall not be granted with
       respect to any claim that was adjudicated on the merits in State court

20       proceedings unless the adjudication of the claim—

21           (1) resulted in a decision that was contrary to, or involved an

22           unreasonable application of, clearly established Federal law, as
           determined by the Supreme Court of the United States; or

23           (2) resulted in a decision that was based on an unreasonable

24           determination of the facts in light of the evidence presented in the
           State court proceeding.

25

26 28 U.S.C.A. § 2254(d).

27

28

A state court's decision is "contrary to" clearly established federal law if the state court: (1) "applies a rule that contradicts the governing law set forth in [Supreme Court] cases"; or (2) "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." Williams v. Taylor, 529 U.S. 362, 405–06 (2000). A state court's decision is an "unreasonable application" of clearly established federal law where the state court "identifies the correct governing legal rule [from Supreme Court decisions] . . . but unreasonably applies [that rule] to the facts of the particular state prisoner's case." White v. Woodall, 572 U.S. 415, 425 (2014) (quoting Williams, 529 U.S. at 407–08). In assessing a state prisoner's habeas petition, a reviewing federal court must decide whether the state court's application of governing federal law is "not only erroneous, but objectively unreasonable." which is a significantly higher threshold. See Yarborough v. Gentry, 540 U.S. 1, 4 (2003); see also Waddington v. Sarausad, 555 U.S. 179, 190 (2009). This highly deferential standard requires "a showing of error greater than clear error." Medina v. Hornung, 386 F.3d 872, 877 (9th Cir. 2004). Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412; see also Marshall v. Rodgers, 569 U.S. 58, 64 (2013) ("Circuit precedent may not be used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that the Supreme Court has not announced.").

When a state supreme court does not provide any explanation for its decision, the reviewing federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018); see also Ylst v. Nunnemaker, 501 U.S. 797, 803–04 (1991) (providing that a reviewing federal court may look through to the last reasoned state court decision). Where a state court summarily denied a claim, a presumption exists "that the

1  state court adjudicated the claim on the merits . . . [,]" unless "there is reason to think

2  some other explanation for the state court's decision is more likely."  Harrington v.

3  Richter, 562 U.S. 86, 99–100 (2011).  If the state court provided no explanation for its

4  decision, reviewing federal courts "determine what arguments or theories supported or

5  . . . could have supported, the state court's decision; and then it must ask whether it is

6  possible fairminded jurists could disagree that those arguments or theories are

7  inconsistent with the holding in a prior decision of [the Supreme] Court."  Id. at 102.

8        Habeas relief is also available where the state court's adjudication of a claim

9  "resulted in a decision that was based on an unreasonable determination of the facts in

10  light of the evidence presented in the State court proceeding."  28 U.S.C.A. § 2254(d)(2);

11  see also Wood v. Allen, 558 U.S. 290, 293 (2010).  Again, the reviewing federal court will

12  not overturn a state court's decision unless the state court's factual determinations

13  were objectively unreasonable.  See Miller-El, 537 U.S. at 340; see also Rice v. Collins,

14  546 U.S. 333, 341–42 (2006) (the fact that "[r]easonable minds reviewing the record

15  might disagree" does not render a decision objectively unreasonable).  Petitioner may

16  overcome the presumption that the state court's factual findings are correct only by

17  clear and convincing evidence.  See 28 U.S.C.A. § 2254(e)(1); Schriro v. Landrigan, 550

18  U.S. 465, 473–74 (2007).

19                    **III.  DISCUSSION**

20        Beason's Amended Petition raises six claims.  In his first claim, Petitioner contends

21  that the inclusion of irrelevant physical evidence seized at the time of his arrest was

22  unfairly speculative and violated his due process rights.  (ECF No. 5 at 13–20.)  Second,

23  Petitioner argues that his due process rights were violated when the trial court

24  permitted a law enforcement officer to present improper lay opinion testimony.  (Id. at

25  20–25.)  Third, Petitioner argues that the first and second claims of evidentiary error

26  collectively prejudiced his trial, constituting a violation of due process.  (Id. at 25-27.)

27  Fourth, Petitioner argues his conviction was a miscarriage of justice.  (Id. at 27–28.)

28

1   Fifth, Petitioner argues that his trial attorney was ineffective because she failed to

2   investigate an alibi defense and refused to permit Beason to testify at trial.  (Id. at 28–

3   35.)  Finally, Petitioner argues that new evidence proves his actual innocence.  (Id. at

4   35–37.)

5   **A.   Admission of the Contested Evidence at Trial Did Not Violate Petitioner's**

6   **Constitutional Right to Due Process**

7   Petitioner's first two claims allege that the trial court's improper admission of

8   evidence violated his right to due process.  (Id. at 13-27.)  In his first claim, Petitioner

9   contends the trial court improperly admitted a towel and binoculars seized from his car

10   roughly two months after the robbery had occurred.  (Id. at 14.)  More specifically,

11   Petitioner argues that the towel and binoculars were irrelevant because they were

12   inherently speculatory and prejudicially suggested that he had a "robbery kit" in his car.

13   (See id. at 14–19.)  In his second claim, Petitioner argues that the trial court improperly

14   admitted Detective Padilla's lay opinion testimony, "matching" the gait of the suspect

15   seen in the surveillance video to Petitioner's, and denying him a fair trial.  (Id. at 20.)

16   Petitioner's third claim asserts that, even if the flawed admission of evidence described

17   in claims one and two were independently insufficient, the cumulative effect of those

18   admissions violated due process.  (Id. at 25–27.)

19   Respondent contends that there is no clearly established federal law regarding

20   when the admission of irrelevant or prejudicial evidence constitutes a due process

21   violation, which gives the state court "broad leeway" in ruling on evidentiary issues.

22   (ECF No. 11-1 at 6.)  Respondent therefore asserts this Court effectively cannot conclude

23   under AEDPA that the state court unreasonably applied clearly established law, which

24   renders the state court's decision reasonable.  (Id.)

25   //

26   //

27   //

28

### 1.   State court opinion

The California Supreme Court denied Beason's evidentiary claims without comment or citation.  (See ECF No. 5 at 39.) [1]  Because there is no reasoned opinion from the state high court, this Court must look through to the last reasoned state court decision to address these claims.  See Ylst, 501 U.S. at 805–06.  Here, that is the opinion of the California Court of Appeal for Fourth Appellate District.  (See ECF No. 11-8.)  On direct appeal, the state appellate court found that the trial court had not abused its discretion by admitting the towel and binoculars into evidence:

> Only relevant evidence is admissible. (Evid. Code, § 350; People v. Babbitt (1988) 45 Cal.3d 660, 681.)  Evidence Code section 210 defines relevant evidence as that which has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  Evidence is relevant if it tends "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive.  (People v. Daniels (1991) 52 Cal.3d 815, 856 (Daniels).)  A trial court has broad discretion to determine the relevance of evidence.  (Babbitt, at p. 681.)  We review the trial court's decision on admitting evidence for an abuse of discretion.  (People v. Merriman (2014) 60 Cal.4th 1, 58; People v. Hall (2010) 187 Cal.App.4th 282, 294.)

> We do not believe the court abused its discretion in admitting either item. The robber's identity was the main issue in this case.  Though Beason did not identify a different suspect, he did argue he was not the robber.  The defense attorney pointed out that owning a bright green towel would not by itself establish identity, and she expressed concern that a jury would

---

[1]  The Court notes that the "Petition for Review" Respondent provided in Lodgment 7 as having been filed in "California Supreme Court case S263765," was instead a duplicate of the Petition for Review pertaining to Petitioner's habeas petition, which Respondent also included as Lodgment 12.  (See ECF No. 11-2 Notice of Lodgment; compare ECF No. 11-9 with 11-15.)  Although this inadvertent exclusion prevents the Court from reviewing Petitioner's appellate filing before the California Supreme Court to confirm the same claims were raised therein, the parties' agreement that the appellate court's decision on the evidentiary claims is the relevant opinion for AEDPA review renders it unnecessary for this Court to verify the exact content of Petitioner's appellate filing before the California Supreme Court.  (Compare ECF No. 5 at 13 (Petitioner stating "the California Court of Appeal issued the last reasoned decision on the merits from direct appeal.") with ECF No. 11-1 at 12-13 (Respondent stating "the state appellate court's decision denying relief on direct appeal (grounds I, II, & III) . . . are the relevant decisions for purposes of federal review.").)

speculate that just because the defendant owned a green towel, the same color as the one found at the scene, the defendant must be the robber. However, there was some probative value in the similarities between the towels and how they were used.  The towel in Beason's vehicle was wrapped around the gun contained in the satchel in the center console of his vehicle.[2] During the robbery, the suspect similarly held the gun wrapped in a towel. The prosecutor explained that carrying a gun in that way is not common, proper, or legal.  Not only was the gun protected in the same manner, by using the same type of material in the same way, but it also contributed to preventing of DNA from coming into contact with the weapon, both in the vehicle and on the weapon used during the robbery.  The inclusion of the towel found in the vehicle did not abuse discretion because it was relevant, as it tended to show, by reasonable inference, material facts.  (See Evid. Code, § 210; Daniels, supra, 52 Cal.3d at p. 856.)

When the court admitted the binoculars that were recovered from Beason's vehicle, defense counsel questioned their relevance.  She noted the binoculars were recovered a couple months after the robbery, were not illegal to possess, and were useful for legitimate purposes, including sporting events.  She contended their existence was not relevant because it did not connect the vehicle to the scene of the robbery, and there was no evidence that the store was cased before it was robbed.  There was, however, evidence the robbery was planned because the perpetrator entered the market moments after it opened for the day, carrying an empty gas can as a ruse.  The binoculars, taken in conjunction with other items in the vehicle, including the gun (whether it is considered wrapped in a towel or not), and a black hoodie sweatshirt, tends to establish the defendant carries with him tools consistent with those of the perpetrator here.  As to the issue of whether the introduction of binoculars, which are not illegal to own or carry, caused any prejudice (Evid. Code, § 352), as the trial court noted, the defense could point out lawful uses for binoculars on cross-examination.  Thus, their

---

[2]  In his opening brief, Beason implies that the towel from the vehicle was improperly admitted because "the provenance of the towel was ambiguous." Detective Padilla testified he saw the butt of the gun in the satchel and removed it to secure it, but he did not notice or look for anything else in the bag at the time. The items taken from the defendant's vehicle were collected and placed in paper bags, secured in a police vehicle trunk, taken to headquarters, and photographed. Items photographed together were found together, including the satchel, the green towel, and the handgun. Although the detective did not see the towel in the satchel with the gun when he removed the gun, he later learned it was recovered from inside the same satchel.  (ECF No. 11-8 at 6–9 (footnote from appellate court opinion).)

probative value outweighed any undue prejudice.  (See ibid.)  We cannot say that admitting this evidence was an abuse of discretion.

(ECF No. 11-8 at 6–9.)

The state appellate court also determined that the trial court's admission of Detective Padilla's testimony was not an abuse of discretion:

> Lay witness testimony is admissible if it is rationally based on the perception of the witness and helpful to a clear understanding of the witness's testimony. (Evid. Code, § 800.)  Admission of lay witness testimony falls within a court's discretion (People v. Bradley (2012) 208 Cal.App.4th 64, 83), and "Court of Appeal decisions have long upheld admission of testimony identifying defendants in surveillance footage or photographs." (People v. Leon (2015) 61 Cal.4th 569, 601 (Leon).)

> "[L]ay opinion testimony concerning the identity of a robber portrayed in a surveillance camera photo of a robbery is admissible where the witness has personal knowledge of the defendant's appearance at or before the time the photo was taken and his testimony aids the trier of fact in determining the crucial identity issue."  (People v. Ingle (1986) 178 Cal.App.3d 505, 513 (Ingle).)  "Where the photo is unclear, or the defendant's appearance has changed between the time the crime occurred and the time of trial, or where for any reason the surveillance photo is not conclusive on the identity issue, the opinion testimony of those persons having knowledge based upon their own perceptions (Evid. Code, § 800, subd. (a)) of defendant's appearance at or before the time the crime occurred is admissible on the issue of identity, and such evidence does not usurp or improperly invade the province of the trier of fact."  (Id. at p. 513.)

> There are two requirements for lay opinions regarding identification from surveillance video: (1) the witness must have personal knowledge of the defendant's appearance; and (2) the testimony must aid in determining a crucial identity issue.  (People v. Mixon (1982) 129 Cal.App.3d 118, 128 (Mixon).)  However, personal knowledge of a defendant's appearance does not have to be based on contact occurring before the crime; it can be based on contact with the defendant around the time of the crime.  (Leon, supra, 61 Cal.4th at pp. 600–601 [familiar with defendant beginning at time of arrest for target crime]; Ingle, supra, 178 Cal.App.3d at p. 514 [permitting victim's opinion testimony that the person portrayed as the robber was the defendant].)  Questions about the extent of a witness's familiarity with the

defendant's appearance go to the weight of the testimony, not its admissibility.  (<u>Leon</u>, at p. 601.)

We review the admission of lay opinion testimony regarding the identity of a person on video under an abuse of discretion standard.  (<u>Leon</u>, <u>supra</u>, 61 Cal.4th at p. 600.)  We will not disturb the decision "except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (<u>People v. Rodriguez</u> (1999) 20 Cal.4th 1, 9–10.)

We are not persuaded that expert testimony from a physical therapist or kinesiologist is required to describe how a person walks.  For example, in <u>Mixon</u>, <u>supra</u>, 129 Cal.App.3d at p. 131, and <u>People v. Perry</u> (1976) 60 Cal.App.3d 608, 613, the courts permitted testimony by police officers who were familiar with the defendants prior to the crimes.  And in <u>Ingle</u>, the court permitted testimony from a lay witness, the victim, who viewed the defendant's physical features during the robbery.  (<u>Ingle</u>, <u>supra</u>, 178 Cal.App.3d at p. 513.)  In <u>Ingle</u> the court explained the testimony about identity did not invade the province of the trier of fact.  (<u>Ibid</u>.)

Although the detective here did not know Beason before the arrest for robbery, he did observe Beason in person within a couple months of the crime.  Detective Padilla's testimony about Beason's gait occurred in the context of a broader discussion of Beason's physical appearance and how that compared to the robber's physical appearance.  He did not claim any expertise in examining a person's gait; he merely described what he observed.  This testimony was helpful because his familiarity with Beason's features could aid in identifying the subject in the surveillance video. Additionally, the surveillance footage was, as the defense attorney described, grainy and jerky; thus, witness testimony could aid the jury as to the identity of the robber.

Moreover, the court instructed the jury that it was not required to accept opinion testimony, and that it could give opinion testimony the weight to which it felt the opinion was entitled.  (CALCRIM No. 226; CALCRIM No. 333.)

Beason argues the inclusion of this testimony was prejudicially erroneous because the prosecutor encouraged the jury to use the testimony to overcome reasonable doubt.  Beason further argues the significance of the testimony is inferred from a jury question; jurors asked, "Are we allowed

to consider our own visualization/observation of Mr. Beason from inside/outside the courtroom (example, in the hallway) in our discussion." When the attorneys appeared the next morning, the court explained that it believed the jury had a verdict.  Nevertheless, the court sent its response to the jury, commenting it would be speculative to know what visualization or observation the jury was referencing, and noting the jury could ask further questions.  The court's written response directed the jury to "[p]lease see CALCRIM 222[,]" which tells jurors they "must disregard anything [they] saw or heard when the court was not in session, even if it was done or said by one of the parties or witnesses."  (See CALCRIM No. 222.)  Shortly thereafter, the jury returned its guilty verdict for robbery and found the allegation that Beason personally and intentionally used a handgun in the commission of the robbery to be untrue.

Beason argues there is no way to know whether the jurors wanted to use their own observations of Beason to confirm or refute Detective Padilla's observation, but the question suggests the jury was considering this testimony, making it reasonably likely at least one juror relied on the detective's opinion.  We disagree.

Although the jury indicated it reached a verdict before the court sent its answer to their question, it had an opportunity to review the court's response to its question before presenting the verdict to the court.  Thus, we cannot read into this exchange the foundation for the jury's ultimate guilty verdict.  Even were we to conclude there was error in admitting this testimony, we would nonetheless conclude any error was harmless, as we discuss post.

(ECF No. 11-8 at 9–13.)

## 2.  Federal law

Admissibility of evidence is a matter of state law, and "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 67–68 (1991); accord Kipp v. Davis, 971 F.3d 939, 955 (9th Cir. 2020) ("A federal habeas court [ ] cannot review questions of state evidence law.") (quoting Henry v. Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999)).  In habeas petitions, federal courts are limited to decide only "whether a conviction violated the Constitution, laws, or treaties of the United States."  Estelle, 502 U.S. at 68.  "If Supreme

14

1  Court cases 'give no clear answer to the question presented,' the state court's decision

2  cannot be an unreasonable application of clearly established federal law." <u>Ponce v.</u>

3  <u>Felker</u>, 606 F.3d 596, 604 (9th Cir. 2010) (quoting <u>Wright v. Van Patten</u>, 552 U.S. 120,

4  126 (2008)).  "Circuit precedent may not serve to create established federal law on an

5  issue the Supreme Court has not yet addressed." <u>Holley v. Yarborough</u>, 568 F.3d 1091,

6  1097–98 (9th Cir. 2009) (citing <u>Carey v. Musladin</u>, 549 U.S. 70, 76–77 (2006)).  The

7  Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly

8  prejudicial evidence constitutes a due process violation sufficient to warrant issuance of

9  the writ." <u>Id.</u> at 1101.  "Absent such 'clearly established Federal law,' [federal district

10  courts] cannot conclude that the state court's ruling was an 'unreasonable application.'"

11  <u>Id.</u> (citing <u>Carey</u>, 549 U.S. at 77).

12        Even if the argument is not foreclosed by the restrictive standards of the AEDPA,[3]

13  "[t]he admission of evidence does not provide a basis for habeas relief unless it

14  rendered the trial fundamentally unfair in violation of due process." <u>Johnson v. Sublett</u>,

15  63 F.3d 926, 930 (9th Cir. 1995) (citing <u>Estelle</u>, 502 U.S. at 67–69).  The Ninth Circuit has

16  held that evidentiary admissions can only violate due process "if there

17  are *no* permissible inferences the jury may draw from the evidence. Even then, the

18  evidence must 'be of such quality as necessarily prevents a fair trial.'" <u>Jammal v. Van de</u>

19  <u>Kamp</u>, 926 F.2d 918, 920 (9th Cir. 1991) (citing <u>Kealohapauole v. Shimoda</u>, 800 F.2d

20  1463, 1465 (9th Cir. 1986)).  The Supreme Court has accordingly "defined the category

21  of infractions that violate 'fundamental fairness' very narrowly." <u>Dowling v. United</u>

22  <u>States</u>, 493 U.S. 342, 352 (1990) (holding that testimony regarding a crime the petitioner

23  was previously acquitted of did not render the petitioner's trial fundamentally unfair);

24

25

26  [3] The AEDPA also allows relief when a state court decision was "based on an unreasonable

27  determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C.
§ 2254(d)(2).  Beside a mere mention of this provision (and the AEDPA in general), Petitioner does not
discuss issues with the state court's factual findings; thus, this Court will not assess whether the state

28  court's decision was based on an unreasonable factual determination.

1  see also Perry v. New Hampshire, 565 U.S. 228, 237–39 (2012) (discussing that the

2  knowing use of false evidence by a prosecutor, or the admission of improperly

3  developed witness identification evidence where the police created a "substantial

4  likelihood of misidentification" of a suspect would render a trial fundamentally unfair).

5        Under the AEDPA, the Court is precluded from granting habeas relief to Petitioner

6  on erroneous state court evidentiary admission grounds because there is no clearly

7  established federal law.  The Supreme Court has specifically reserved the issue of when

8  the prejudicial admission of *any* evidence constitutes a violation of due process.  See

9  Holley, 568 F.3d at 1101 (citing Estelle, 502 U.S. at 67–68).  In Holley, the Ninth Circuit

10 denied the petitioner habeas relief despite finding his conviction for child molestation

11 was the result of a "trial that was fundamentally unfair and would warrant issuance of a

12 writ under [Ninth Circuit] precedent."  Id. n.2.  The Holley court found that pornographic

13 materials admitted into evidence from the petitioner's house were "both irrelevant and

14 highly likely to be prejudicial," and had a "substantial and injurious effect on the jury's

15 verdict."  Id.  Nonetheless, the court held that "[i]n cases where the Supreme Court has

16 not adequately addressed a claim, this court cannot use its own precedent to find a

17 state court ruling unreasonable."  Id. at 1101.  Thus, "even clearly erroneous admissions

18 of evidence that render a trial fundamentally unfair may not permit the grant of federal

19 habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid out by

20 the Supreme Court."  Id.

21        Petitioner's case bears no material distinctions from Holley, and he does not cite

22 any authority suggesting that his claim is an exception, nor does he provide any

23 Supreme Court guidance stating when an evidentiary admission constitutes a violation

24 of due process.  Instead, Petitioner argues that the state court's application of state law

25 "so infected the entire trial that the resulting conviction violates due process" based

26 solely on a pre-AEDPA decision.  (ECF No. 5 at 18 (citing Estelle, 502 U.S. at 71-72).)

27 However, more recent federal precedent, such as Holley, prevents this Court from

28

accepting Petitioner's argument.  Accordingly, the state court could not have unreasonably applied federal law as to an issue that the Supreme Court has not yet ruled on, and this Court's analysis may rest here.

But even if clearly established federal law was applicable here, the state appellate court recognized permissible inferences that could be drawn from all the evidence in question, which is sufficient to satisfy the due process standard discussed in Estelle and Jammal.  See Jammal, 926 F.2d at 919–20; Estelle, 502 U.S. at 71-72; see also, e.g., Edwards, 2016 WL 3092088.

### a. Admission of physical evidence

In his first claim, Petitioner contends that the towel and binoculars found in his car two months after the robbery had no probative value and their admission was inherently speculative and irrelevant.  (ECF No. 5 at 16.)  Petitioner argues that the admission of the towel and binoculars "allowed" the possibility for the jury to speculate that Petitioner had a "robbery kit" in his car.  (Id. at 17–18.)  To establish that the state court proceedings were so fundamentally unfair as to violate due process here, Petitioner must show that there are *no* permissible inferences to be made that would result in a due process violation, not just that the towel and binoculars "allowed" for speculation.  Jammal, 926 F.2d at 920.  On direct review, the state appellate court determined that the towel and binoculars logically suggested Petitioner's identity and were therefore relevant as evidence.  (ECF No. 11-8 at 7–9.)

With regard to the towel, this Court cannot find that there were no permissible inferences to be made by the jury.  Petitioner asserts that because the towel found at the scene of the robbery and the one found with the gun were different brands, the towel from his car was inherently speculative.  (ECF No. 5 at 16–17.)  During the robbery, the suspect carried a gun covered in a similar towel which he dropped at the scene, and which had Petitioner's DNA on it.  (ECF No. 11-4 at 377–78.)  Upon Petitioner's arrest, a handgun was found in a bag, stored with a similar towel.  (Id. at 254–55.)  At trial, the

17

prosecutor argued that this was an uncommon and illegal way to carry a gun, meant to prevent the transfer of DNA to the firearms.  (Id. at 568–69.)  Here, the jury could draw inferences of identity between the uncommon way the robber covered the gun with a towel and the fact that Petitioner illegally possessed a gun stored similarly with a towel.  Furthermore, Petitioner's trial counsel discussed at length why she thought the towel was not of probative value, and the jury was able to weigh her argument accordingly.  (Id. at 555–57.)  Because there are permissible inferences, and Petitioner raises no federal authority stating otherwise, the admission of the towel did not violate due process.

Petitioner's argument that the admission of the binoculars violated his right to due process similarly fails, as there remained permissible inferences for the jury to make.  Petitioner argues the binoculars are irrelevant because they were discovered in his car two months after the robbery, the vehicle had not been linked to the robbery, and binoculars are lawful to possess.  (ECF No. 5 at 17–18.)  Petitioner's argument, however, fails to address the state court's discussion that the record suggested "the robbery was planned because the perpetrator entered the market moments after it opened for the day, carrying an empty gas can as a ruse."  (ECF No. 11-8 at 8–9.)  When the binoculars are weighed in light of the gun and towel found in Petitioner's car, the clothing consistent with that of the suspect found in his house, and the way the robbery appeared to have been planned, the jury could draw a permissible connection between all the evidence.  Furthermore, trial counsel had the opportunity to contest the planned robbery theory in front of the jury, who considered the evidentiary weight of the binoculars themselves.  (ECF No. 11-4 at 553.)  Accordingly, a jury could reasonably infer that Petitioner had the binoculars in his car to case potential robbery targets.  Because Petitioner did not raise any federal authority suggesting that this was an impermissible inference, the admission of the binoculars did not violate his due process rights.

//

### b. Admission of lay opinion testimony

In his second claim, Petitioner argues that Detective Padilla's testimony matching his gait to that of the suspect in the surveillance video was inadmissible lay opinion testimony, and its admission violated his due process rights.  (ECF No. 5 at 20.)  Specifically, Petitioner argues that Detective Padilla's testimony went beyond Petitioner's appearance, and into the technical area of kinesiology, in which he had no expertise.  (Id. at 23-24.)  Detective Padilla testified that he noticed a distinct similarity in the manner that Petitioner and the suspect walked, each with their knees pointed inward.  (ECF No. 11-4 at 270.)  To the extent that Petitioner argues the lay opinion testimony should not have been admitted by the state court under California evidentiary standards (see ECF No. 5 at 21–24), this Court cannot review the state court's state law finding absent guidance from the Supreme Court.  See Estelle, 502 U.S. at 67–68; Holley, 568 F.3d at 1101.  Petitioner must show the testimony had no permissible inferences, which would render his trial fundamentally unfair.  Jammal, 926 F.2d at 920.

In this case, assuming that the testimony was properly admitted, the jury could have reasonably inferred that Petitioner and the suspect seen in the security footage walked with a similar gait, which may suggest identity.  Even if improperly admitted, this lay opinion testimony was only a small fraction of the evidence brought forth at trial, and the state court reasonably found that it would have been harmless error.  (See ECF No. 11-8 at 13–16.)

Accordingly, this Court recommends that habeas relief be denied as to claims one and two because, even if not precluded by AEDPA, Petitioner did not show that *no* permissible inferences could be made from the evidence presented in the state proceedings that would render his trial fundamentally unfair.

//

//

**B.     The Cumulative Admission of the Contested Evidence Did Not Violate Petitioner's Due Process Rights**

In his third claim, Petitioner argues his conviction should be vacated because the combined errors of admission described in his first and second claims prejudiced his trial and violated his right to due process.  (ECF No. 5 at 25–27.)  Respondent recognizes that Ninth Circuit precedent sometimes permits an aggregate due process violation finding when specific trial errors fail to warrant habeas relief on their own but contends that there were no erroneous admissions that would amount to such a finding; thus the state court's decision was reasonable.  (ECF No. 11-1 at 13.)

**1.  State court opinion**

The state appellate court found that because no individual erroneous evidence was admitted, there could be no cumulative due process violation.  The state court also found that even if the contested evidence was admitted in error, the cumulative effect would be harmless, writing:

> Beason contends the cumulative effect of the asserted evidentiary errors violated his federal and state constitutional rights to due process.  We have rejected all Beason's claimed errors except those involving sentencing, which we address post, and which did not render the trial unfair.  Because the evidentiary ruling [sic] were not erroneous, the cumulative error argument necessarily fails.  (People v. McWhorter (2009) 47 Cal.4th 318, 377 [no cumulative effect of error when no error]; People v. Butler (2009) 46 Cal.4th 847, 885 [rejecting cumulative effect claim when court found "no substantial error in any respect"].)  Even were evidence of the towel, the binoculars, and the testimony about Beason's gait improperly admitted, their admission was not prejudicial.

> We test for prejudice under the People v. Watson (1956) 46 Cal.2d 818 (Watson) harmless error test.  (See People v. Alcala (1992) 4 Cal.4th 742, 790-791.)  Under this test, a judgment may be overturned only if "it is reasonably probable that a result more favorable to the [defendant] would have been reached in the absence of the error."  (Watson, at p. 836.)  Additionally, when there are multiple trial errors, though any one of them may be "independently harmless, [collectively they] may in some circumstances rise by accretion to the level of reversible and prejudicial error.  [Citations.]"

(People v. Hill (1998) 17 Cal.4th 800, 844-845.)  When addressing cumulative error, "the litmus test is whether [a] defendant received due process and a fair trial."  (People v. Kronemyer (1987) 189 Cal.App.3d 314, 349.)  Under this standard, the cumulative errors are prejudicial if it cannot be established beyond a reasonable doubt that the error had no effect on the jury verdict.  (Chapman v. Cal. (1967) 386 U.S. 18, 24 (Chapman).)  Under either standard, we would conclude any of the alleged errors or their cumulative effect was harmless.

The admission of the towel from the vehicle, the binoculars, and the testimony about Beason's mannerisms as he walks neither individually nor cumulatively rise to the level of prejudicial error.  Excluding the towel and binoculars recovered from the vehicle and the testimony about Beason's gait either individually or collectively leaves ample evidence connecting Beason to the crime scene.

Immediately following the robbery, the victim described the robber as a Black man who stood about six feet two inches tall with a "bigger build." He told the 911 operator the robber was between 30 and 40 years old; had a big, muscular build; was wearing a black jacket and possibly black pants; brought in a gas can with him; and had a gun.  In addition to matching the physical description provided by the victim to 911 immediately following the robbery and the victim's description of the perpetrator during trial, the robber on video surveillance matched the description and matched the defendant.  The video also showed the robber holding a towel like the one recovered at the scene and containing DNA that matched Beason's, and the towel dropping from the robber's pocket as he left the store.

Police recovered from Beason's vehicle a loaded handgun and an empty gas can.  And they found shoes and a pair of black pants in Beason's home, which were similar to what the robber wore at the time of the crime. Additionally, although the gloves police recovered from Beason's home did not match the gloves in the video surveillance, both sets of gloves were motorcycle gloves.  Finally, the jury viewed the video surveillance of the robbery, so it could draw comparisons to the defendant at trial.

The totality of the unchallenged evidence, recognizing in particular the significance of Beason's DNA matching DNA on the towel recovered from the crime scene, demonstrates beyond a reasonable doubt that the removal of the evidence complained of would not have altered the verdict. (See Chapman, supra, 386 U.S. at p. 24.)

Looking at the evidence challenged individually, our conclusion is the same; its inclusion did not prejudice Beason.  Had the jury never heard the evidence of the towel or binoculars recovered from his vehicle, it is not reasonably probable the outcome would have been different.  (See Watson, supra, 46 Cal.2d at p. 836.)  Likewise had the jury never heard testimony from Detective Padilla about Beason's gait, it is not reasonably probable the outcome would have been different.   Beason matched the physical description of the perpetrator; his DNA was found on the towel the perpetrator left at the scene of the crime; and Beason carried with him in his vehicle items similar to those used in the robbery and common to those used in crimes: a handgun, a dark hoodie, and a gas can.  Moreover, the jury members had the opportunity to compare what they had observed of Beason themselves while court was in session and could draw their own conclusions about whether Beason was the perpetrator in the video.

Because it is not reasonably probable the exclusion of the detective's testimony, the towel from the vehicle, or the binoculars individually would have resulted in a more favorable outcome for Beason, any single alleged error was harmless.  (See Watson, supra, 46 Cal.2d at p. 836.)  And because there is no reasonable doubt that their collective exclusion would not have changed the outcome, there is likewise no prejudice under Chapman.

(ECF No. 11-8 at 13–16.)

### 2.  Federal law

The Ninth Circuit has stated that, "[t]he Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair."  Parle v. Runnels, 505 F.3d 922, 927 (9th Cir. 2007).  Further, "even if no single error were prejudicial, where there are several substantial errors, 'their cumulative effect may nevertheless be so prejudicial as to require reversal.'"  Killian v. Poole, 282 F.3d 1204, 1211 (9th Cir. 2002) (quoting United States v. de Cruz, 82 F.3d 856, 868 (9th Cir. 1996)).  However, when "no error of constitutional magnitude occurred, no cumulative prejudice is possible."  Hayes v. Ayers, 632 F.3d 500, 524 (9th Cir. 2011) (finding the same).

Although both parties generally agree on this standard, a recent decision in this District called into question whether there is clearly established federal law on cumulative error.  See Sanchez v. McDowell, 648 F. Supp. 3d 1241 (S.D. Cal. 2023).  The court reasoned that the Supreme Court's decision in Chambers v. Mississippi, 410 U.S. 284, 302–03 (1973), was narrowly tailored to the particular facts of the case and did not establish new principles of constitutional law.  Id. at 1261.  For the same reasons in Sanchez, this Court need not decide whether the cumulative error doctrine is clearly established federal law because it has already been determined that Petitioner has not identified any evidentiary errors made by the state court and thus no cumulative errors exist.

Having previously found Petitioner has failed to establish any individual constitutional violation, his cumulative prejudice claim should also be rejected.  See Hayes, 632 F.3d at 524; see also Guthrie v. Allison, No. 19cv1452-WQH-AHG, 2023 WL 4142003, at *22 (S.D. Cal. June 22, 2023) (recommending denial of a petitioner's cumulative prejudice claim grounded in multiple evidentiary admissions barred by Holley).

Even if an error was made, the state court's finding that any error—individually or cumulatively—was harmless was objectively reasonable.  (See ECF No. 11-8 at 16.) Petitioner raises in his appellate argument that the two contested evidentiary admissions had a combined prejudicial effect on his conviction.  (Compare ECF No. 11-5 at 35–37 with ECF No. 5 at 25–27.)  Petitioner cites Chapman to argue that because the government cannot establish beyond a reasonable doubt that the alleged trial errors were harmless, his conviction violates due process and requires reversal.  (ECF No. 5 at 26.)  As pointed out by Respondent (see ECF No. 11-1 at 12), the Supreme Court has clearly established that "[w]hen a [state court's] Chapman decision is reviewed under AEDPA, 'a federal court may not award habeas relief under § 2254 unless the harmlessness determination itself was unreasonable.'"  Davis v. Ayala, 576 U.S. 257, 269

23

1   (2015) (quoting Fry v. Pliler, 551 U.S. 112, 119 (2007)).  Under the AEDPA, Petitioner

2   needs to show that the state court's harmless error finding was objectively

3   unreasonable.  See Chapman, 386 U.S. at 24.  Petitioner's restatement of the direct

4   appeal standard of review for Chapman fails to satisfy this burden.

5   　　　　The state court reasonably applied Chapman.  To find otherwise, the state court's

6   ruling must have been so objectively unreasonable that a prejudicial error exists

7   "beyond any possibility for fairminded disagreement."  Davis, 576 U.S. at 270.  By

8   arguing only that the robbery kit evidence and Detective Padilla's lay opinion "provided

9   jurors a path to finding guilt beyond a reasonable doubt based on evidence that should

10  not have been admitted" (ECF No. 5 at 25), Petitioner has not met this burden.

11  Considering the store clerk's description of Petitioner (ECF No. 11-4 at 142), the security

12  footage (id. at 138–45), the gun found in Petitioner's car (id. at 193), and Petitioner's

13  DNA found on a towel dropped by the robber (id. at 377–78), the state court's finding of

14  harmless error was not objectively unreasonable.  Consequently, Petitioner has not

15  shown that the state court's ruling as to prejudice was an unreasonable application of,

16  or contrary to, clearly established federal law.  This Court therefore recommends that

17  claim three be denied.

18  **C.   The State Court Reasonably Rejected Petitioner's Ineffective Assistance of**

19  **Counsel Claim**

20  　　　　In his fifth claim, Petitioner alleges that trial counsel ineffectively represented him

21  in two ways.  (ECF No. 5 at 28.)  First, she failed to investigate his alibi defense that he

22  was at home "zonked out on medication" during the robbery.  (Id. at 30–32.)

23  Respondent contends that this claim is untimely, but in the interest of judicial economy,

24  this Court will analyze Petitioner's IAC argument on the merits.  (ECF No. 11-1 at 16–18.)

25  Respondent asserts the state court's factual finding that Petitioner's trial counsel was

26  unaware of any alibi defense was objectively reasonable.  (Id.)

27

28

Petitioner's second IAC argument is that his trial counsel refused to let him testify, despite his desire to do so.  (ECF No. 5 at 32–35.)  Respondent argues that the state court's finding was objectively reasonable because Petitioner waived his right to testify when he neglected to raise his desire to do so at trial.  (ECF No. 11-1 at 18–21.)

Finally, Petitioner argues both instances of IAC together prejudiced his trial.  (ECF No. 5 at 35.)  Respondent argues that a finding of cumulative error cannot be grounded in multiple non-errors.  (ECF No. 11-1 at 20.)

## 1. State court opinion

In discussing Petitioner's IAC claim on state habeas review, the state court found:

> The ineffective assistance claim has also been forfeited to the extent it is based on the failure to call Beason as a witness at trial.  "When the record fails to disclose a timely and adequate demand to testify, 'a defendant may not await the outcome of the trial and then seek reversal based on his claim that despite expressing to counsel his desire to testify, he was deprived of that opportunity.' " (People v. Alcala (1992) 4 Cal.4th 742, 805-806.)  Beason admits counsel advised him not to testify and "repeatedly" told him, "You have no say in how this case is fought, *only whether you're going to testify*." (Italics added.)  If Beason wished to testify despite counsel's advice not to do so, he had an obligation to speak up at trial.  "A criminal defendant, like any other party to an action, may not sit on his or her rights.  Thus, just as a defendant generally may not raise on appeal a claim not raised at trial [citation], a defendant should not be allowed to raise on habeas corpus an issue that could have been presented at trial.  If a claim that was forfeited for appeal could nonetheless be raised in a habeas corpus proceeding, the main purpose of the forfeiture rule—to encourage prompt correction of trial errors and thereby avoid unnecessary retrials—would be defeated." (In re Seaton (2004) 34 Cal.4th 193, 199-200.)  Beason's failure to overcome these procedural obstacles to his claim "justifies summary denial without the court's consideration of the merits." (In re Reno (2012) 55 Cal.4th 428, 511.)
>
> The claim of ineffective assistance also fails to state a prima facie case for habeas corpus relief.  A habeas corpus petitioner asserting such a claim "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment" and "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (Strickland

v. Washington (1984) 466 U.S. 668, 690, 694; see People v. Ledesma (1987) 43 Cal.3d 171, 215-218 [adopting Strickland standard as California law].) "The decision whether to call certain witnesses is a 'matter[] of trial tactics and strategy which a reviewing court generally may not second-guess.' " (People v. Carrasco (2014) 59 Cal.4th 924, 989.)  In response to Beason's inquiry about the failure to investigate and present the alibi defense, counsel responded, "Beason never told me he had an alibi.  I also spoke with his wife on multiple occasions, and she never said she (or any family member) could provide an alibi.  Had they told me this, I would have investigated the claim and potentially called her (or others) as a witness."  Even had counsel investigated the alibi defense, the obvious credibility problems with the witnesses reasonably could have led to a decision not to call them.  On this record, Beason has not "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " (Strickland, at p. 689.)  Furthermore, as discussed in connection with the new evidence claim, it is not reasonably probable the jury would have reached a different verdict on the robbery charge had counsel put on the alibi defense.  Beason thus has not met his pleading burden to "show that counsel's performance was deficient" and "that the deficient performance prejudiced the defense."  (Id. at p. 687.)

(ECF No. 11-14 at 5–6.)

### 2.  Federal Law

The Supreme Court has clearly established that a petitioner must show trial counsel's performance "fell below an objective standard of reasonableness" to succeed in a federal habeas petition for ineffective assistance of counsel.  Strickland, 466 U.S. at 687–88.  The standard set forth in Strickland "has long been clearly established federal law determined by the Supreme Court of the United States."  Baylor v. Estelle, 94 F.3d 1321, 1323 (9th Cir. 1996).  To satisfy Strickland, a petitioner must show both: (1) their attorney's performance was deficient, and (2) the deficient performance prejudiced their trial.  Strickland, 466 U.S. at 687.  The Court need not address both Strickland's performance and prejudice prongs if a petitioner fails to satisfy one of them.  Id. at 697.

When analyzing Strickland's performance prong, to "eliminate the distorting effects of hindsight" a reviewing court "must indulge a strong presumption that

1  counsel's conduct falls within the wide range of reasonable professional assistance."  Id.

2  at 689.  Thus, a federal habeas review of the state court's IAC ruling is "doubly

3  deferential," as the federal court examines the state court's ruling, which applies an

4  already deferential Strickland standard, through the highly deferential reasonableness

5  lens of the AEDPA.  Knowles v. Mirzayance, 556 U.S. 111, 123 (2009).  A habeas

6  petitioner has the burden to "identify the acts or omissions of counsel that are alleged

7  not to have been the result of reasonable professional judgment."  Strickland, 466 U.S.

8  at 690.  The court must then determine whether, in light of all the circumstances, the

9  identified acts or omissions were outside the wide range of professionally competent

10  assistance.  Id.  Put differently, Petitioner must make a "showing that counsel made

11  errors so serious that counsel was not functioning as the 'counsel' guaranteed the

12  defendant by the Sixth Amendment."  Id. at 687.

13       The prejudice prong is satisfied when "there is a reasonable probability that, but

14  for counsel's unprofessional errors, the result of the proceeding would have been

15  different.  A reasonable probability is a probability sufficient to undermine confidence in

16  the outcome."  Id. at 694.  "The likelihood of a different result must be substantial, not

17  just conceivable."  Harrington, 562 U.S. at 112 (citing Strickland, 466 U.S. at 693).

18       AEDPA review of a Strickland decision sets a bar that is "difficult to meet" and

19  "demands that state court decisions be given the benefit of the doubt."  Cullen v.

20  Pinholster, 563 U.S. 170, 181 (2011) (quoting Harrington, 562 U.S. at 102; Woodford v.

21  Visciotti, 537 U.S. 19, 24 (2002)).  Furthermore, "[t]he petitioner carries the burden of

22  proof."  Id.  "The question 'is not whether a federal court believes the state court's

23  determination' under the Strickland standard 'was incorrect but whether that

24  determination was unreasonable—a substantially higher threshold.'"  Knowles, 556 U.S.

25  at 123 (quoting Schriro v. Landrigan, 550 U.S. 465, 473 (2007)).

26  //

27  //

28

### 3. Analysis

Although Petitioner fails to argue his IAC claims under the AEDPA standard of review, the Court will review the state appellate court's decision for unreasonable applications of federal law or determinations of fact.  To the extent that Petitioner contests any of the state court's factual determinations, he must show that they were objectively unreasonable through clear and convincing evidence.  <u>Miller-El</u>, 537 U.S. at 340.  While Petitioner does not clearly address the state court's finding that his alibi defense is procedurally barred as untimely (<u>see</u> ECF No. 11-14 at 5–6), the Court agrees with Respondent's contention that it is most efficient to address Petitioner's first IAC ground on the merits.  (<u>See</u> ECF No. 11-1 at 17); <u>Franklin v. Johnson</u>, 290 F.3d 1223, 1232 (9th Cir. 2002) ("[A]ppeals courts are empowered to, and in some cases should, reach the merits of habeas petitions if they are, on their face and without regard to any facts that could be developed below, clearly not meritorious despite an asserted procedural bar.")

### a. Failure to investigate Petitioner's alibi

To the extent that Petitioner argues that his trial counsel failed to investigate his alibi defense, the state court's application of <u>Strickland</u> was not objectively unreasonable.  "When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard."  <u>Harrington</u>, 562 U.S. at 105.  Under <u>Strickland</u>'s performance prong, the state court found that Petitioner's trial counsel's performance was not deficient, relying on counsel's statement that she was not aware of Petitioner's alibi witnesses.  (ECF No. 11-14 at 6.)  Under the prejudice prong, the state court found it was not reasonably likely the jury would have returned a different verdict if trial counsel had investigated Petitioner's alibi and presented witnesses who now support his petition.  (<u>Id.</u>)

In its performance prong conclusion that counsel's performance was not deficient because she was unaware of the alibi defense, the state court necessarily made the factual finding that trial counsel was credible when she stated Petitioner and his family "never told me he had an alibi."  (See id. (quoting ECF No. 11-13 at 49–50).)  Petitioner refutes the state court's factual finding, stating that his trial counsel was indeed aware of his alibi defense but chose not to investigate or raise it.  Under AEDPA, the state court's factual findings are "presumed correct absent clear and convincing evidence to the contrary."  Miller-El, 537 U.S. at 324.  Therefore, to find that the state court unreasonably applied Strickland's performance prong, Petitioner must provide clear and convincing evidence contradictive to the state court's conclusion.  Id.

Petitioner's evidence raised in support of his assertion that he was home "zonked out on medication" during the robbery does not overcome the state court's credibility finding by clear and convincing evidence.  (See ECF No. 5 at 31.)  In support of his alibi defense, Petitioner submits his own sworn declaration, and those of his wife (Tamika) and stepson (Tracey).  (ECF No. 5 at 30–32.)  Each declaration was signed in April of 2021 (ECF No. 11-13 at 3–8), nearly three years after Petitioner's June 12, 2018, conviction (see ECF No. 11-4 at 600–03.)  Tamika states that she saw Petitioner asleep in bed at approximately 5 a.m. when she left for work, and that she mentioned this to Petitioner's trial counsel but was told "not [to] worry about that[.]"  (ECF No. 11-13 at 3.)  Tracey states that he saw Petitioner take his pills the night before, and then leave the house at 6:45 a.m. to bring Tamika her keys.  (Id. at 5.)  Petitioner also declares that he informed trial counsel of the alibi, but she told him he had no say in how the case is fought.  (Id. at 7.)  Petitioner further raises his post-conviction letter asking trial counsel for an explanation of why she failed to investigate his alibi.  (ECF No. 5 at 30 (referencing ECF No. 11-13 at 45).)  These post-conviction declarations of Petitioner and his family members do not constitute the type of "clear and convincing evidence" that show "the corresponding factual determination was 'objectively unreasonable.'"  Miller-El, 537

U.S. at 348; see Herrera v. Collins, 506 U.S. 390, 423 (1993) (post-trial affidavits "are to be treated with a fair degree of skepticism") (O'Connor, J., concurring); Perez v. Rosario, 294 F. Supp. 2d 1125, 1134 (N.D. Cal., 2003) (holding that it was not objectively unreasonable for a state court to reject an IAC claim for failure to fully develop an alibi defense based on the post-conviction declarations of a more detailed alibi by petitioner's girlfriend).

The trial record reflects no evidence that trial counsel was aware of any such alibi defense, and no mention of an alibi until the sentencing hearing when Petitioner stated that Tamika "could have told you I was laying in bed when she went to work."  (ECF No. 11-4 at 649.)  Tamika then spoke at the sentencing hearing and stated that Petitioner "needs help," his "mental state wasn't right when this occurred," and "he wasn't himself."  (Id. at 652.)  In her written statement to the court prior to sentencing, Tamika wrote:

> I'm not making any excuses for him, but for the last few months Marlon has clearly not been himself, he wasn't the person I married nor the person that came home to me.  The trials and tribulations of life began to overbear him, he was becoming depressed and isolated, when I noticed it, we sought help for him.  With that being said, his current case is a product of a very remorseful Marlon, that lost his way, he lost his focus, if time could be reminded he would have never done this, and if I was able to recognize the signs and symptoms earlier I could have done more to help him.  This event has clearly has [sic] taken a toll on him, he has beat himself up on numerous occasions for his actions, and if he could rectify the matter, he would, no doubt.  He's definitely remorseful and it's clear this case has changed him.

(ECF No. 11-3 at 292.)

Tamika's testimony for Petitioner's sentencing is not consistent with the testimony of someone who knew Petitioner was innocent because she was his alibi but was prevented from testifying by Petitioner's attorney.  Furthermore, the trial counsel's uncontested statement at the Marsden hearing points out that Petitioner was not willing to call Tamika to testify about how old his neck tattoo was.  (ECF No. 11-13 at

30

37.)  Counsel further stated that she had to hire an investigator to search online for dated images of Petitioner with the tattoo because Petitioner did not want Tamika to testify.  (Id.)  Petitioner's post-conviction assertion that Tamika would have indeed testified to his alibi defense is thus contradicted by his pre-trial preference against calling her to testify to other material facts and her sentencing statements.  Accordingly, Petitioner's trial attorney did not unreasonably ignore alibi evidence or fail to investigate it.

Finally, Petitioner declares that he gave counsel his medication list prior to the trial (id. at 7) and argues "any professional that knows the strength of those medications taken together could easily conclude Petitioner was knocked out asleep on those medications at the time of the crime."  (ECF No. 5 at 31.)  Petitioner did not mention his medication list during the Marsden hearing (ECF No. 11-13 at 32–38) or in his pre-habeas emails with trial counsel regarding her failure to investigate his alibi defense (id. at 45–53).  The only time Petitioner mentions his medication is at the sentencing hearing, where he stated his counsel found his "mental health and prescribed medications at the time this crime was committed [to be] irrelevant."  (ECF No. 11-4 at 649.)  Even if he provided such a list, this alone would not inherently support the theory that trial counsel was aware of an alibi and failed to investigate it.

Because Petitioner has not provided any pre-conviction support for his argument, Petitioner has not rendered the state court's credibility determination objectively unreasonable through clear and convincing evidence.  Accordingly, the state court's analysis of Strickland's performance prong was not objectively unreasonable.  Having found the state court's performance determination is reasonable is sufficient to recommend the denial of Petitioner's IAC claim.  See Strickland, 466 U.S. at 697. [4]

---

[4]  The state court also noted that even if Petitioner's trial counsel had been aware of alibi witnesses, her refusal to call them to testify would nonetheless have been reasonable considering witness credibility issues.  (ECF No. 11-14 at 6.)

1    Nevertheless, this Court will analyze whether the state court's prejudice prong

2   analysis was also reasonable.  See id. at 687; Harrington, 562 U.S. at 112.  The state

3   court found that, even if Petitioner submitted his alibi defense, it was not likely to have

4   led to a different outcome.  As discussed above, Tamika and Tracey have credibility

5   issues involving bias and motive, in addition to Tamika's contradictory testimony for the

6   sentencing hearing.  To the extent Tamika and Tracey would have been called to testify

7   to this alibi defense at trial, these credibility issues likely would have been raised in front

8   of the jury on cross-examination.  See Cal. Evid. Code § 785–91.  If Petitioner were called

9   to testify to this alibi defense, the prosecution would have been able to raise character

10  evidence and prior convictions that were otherwise absent from the trial.  Id.

11    The credibility issues discussed above would likely have colored the jury's

12  impression regarding the credibility of the alibi defense.  Had Petitioner and his family

13  testified to this alibi defense, they may have faced a strong possibility of impeachment

14  by the prosecution.  Petitioner raises no other evidence aside from (1) the post-

15  conviction emails where his trial counsel confirms she did not know of or investigate an

16  alibi; (2) the allegation that he provided trial counsel with a list of his medications prior

17  to trial; and (3) post-conviction declarations of himself, his wife, and his stepson.  These

18  facts do not overcome the highly deferential standard the Court must apply here.

19  Accordingly, Petitioner has not shown that the state court's Strickland prejudice finding

20  was objectively unreasonable.  Considering that both Strickland prongs must be satisfied

21  to establish an IAC claim, Petitioner is not entitled to relief on the grounds of his alibi

22  defense.  Strickland, 466 U.S. at 697.

23    **b.  Prohibiting Petitioner from testifying**

24    Petitioner's second ground for IAC is that trial counsel performed deficiently

25  when she "overrode" his decision to testify due to concerns with his credibility, which

26  constituted an impermissible violation of his constitutional right to testify at his own

27  trial.  (ECF No. 5 at 33.)  Respondent claims the state appellate court reasonably

28

1  concluded Petitioner waived his right to testify by not demanding to do so at trial.  (ECF

2  No. 11-1 at 18-20.)  Further, Respondent asserts that Petitioner's instant claim that he

3  intended to testify is not credible.  (Id. at 19.)

4      It is well established that criminal defendants have a constitutional right to testify

5  on their own behalf.  Rock v. Arkansas, 483 U.S. 44, 49–52 (1987).  The decision to

6  testify is personal, and "may only be relinquished by the defendant, and the defendant's

7  relinquishment of the right must be knowing and intentional."  United States v. Pino-

8  Noriega, 189 F.3d 1089, 1094 (9th Cir. 1999) (quoting United States v. Joelson, 7 F.3d

9  174, 177 (9th Cir. 1993); see also Jones v. Barnes, 463 U.S. 745, 751 (1983).  Yet, while

10  the "waiver of the right to testify must be knowing and voluntary, it need not be

11  explicit."  Pino-Noriega, 189 F.3d at 1094.  The trial court has no duty to inform a

12  defendant of this right, and "[w]hen a defendant remains 'silent in the face of his

13  attorney's decision not to call him as a witness,' he waives the right to testify."  Id.

14  (quoting United States v. Nohara, 3 F.3d 1239, 1244 (9th Cir. 1993).  Furthermore, "if the

15  defendant says nothing until after the verdict has been read, the right has been

16  waived."  Id. at 1095.  "A defendant who wants to reject his attorney's advice and take

17  the stand may do so 'by insisting on testifying, speaking to the court, or discharging his

18  lawyer.'"  Id. (quoting Joelson, 7 F.3d at 177.)  This waiver is applied in both freestanding

19  constitutional claims, and IAC claims.  See, e.g., Demyers v. Adams, 47 F. App'x 454, 455

20  (9th Cir. 2002) (citing Pino-Noriega, 189 F.3d at 1095).

21      Here, the record abundantly demonstrates that Petitioner understood the

22  decision whether to testify at trial was his.  First, Petitioner concedes his lawyer told him

23  on multiple occasions that the decision to testify was his alone.  (See ECF No. 5 at 33

24  ("but Ms. Marshall told Petitioner repeatedly, 'You have no say in how this case is

25  fought, only whether you're going to testify or not.' "); No. 11-13 at 33 (transcript of the

26  Marsden hearing where Petitioner stated "I only have a say-so whether I testify or

27

28

1   not").)[5]  Petitioner now asserts without any evidentiary support, that his trial counsel

2   told him "he was not testifying" on June 4, 2018.  (ECF No. 5 at 33.)  In response to his

3   email inquiries, Petitioner's trial counsel denied that she refused to permit Petitioner to

4   testify and insisted that she advised him of the pros and cons of testifying but told him

5   that "the ultimate decision was his."  (Id. at 49.)  Because the trial record indicates

6   Petitioner knew the decision to testify belonged to him, and points to nothing in the

7   record showing he insisted on testifying, spoke with the court regarding his desire to

8   testify, or discharged his lawyer due to being blocked from testifying, Petitioner waived

9   the right to do so.  Pino-Noriega, 189 F.3d at 1094.  The state court's finding that

10  Petitioner had waived his right to testify at trial was therefore objectively reasonable,

11  which precludes habeas relief as to the second ground of Petitioner's IAC claim.

12  Because this claim is waived, it is unnecessary to address Respondent's argument that

13  Petitioner's credibility is questionable.

### c.  Cumulative IAC

15       Finally, Petitioner argues that the cumulative effect of his two IAC grounds

16  prejudiced his defense and require the reversal of his conviction.  (ECF No. 5 at 35.)

17  Respondent contends that absent any individual errors by trial counsel, there can be no

18  cumulative error.  (ECF No. 11-1 at 20.)  Because Petitioner has not shown that his trial

19  counsel made any individual errors, his claim of cumulative error necessarily fails.  Davis

20  v. Woodford, 384 F.3d 628, 654 (9th Cir. 2004) (failure to demonstrate prejudice as to

21  the individual grounds precludes a finding of cumulative IAC).  Since it has not been

22  shown that there were any instances of deficient performance by his trial counsel,

23  Petitioner is not entitled to relief under his cumulative theory of IAC.

24

25

26  [5]  The grievances Petitioner raised at his Marsden hearing mostly involved claims that his attorney was
    unprepared for trial and that she and the prosecution exchanged "favors."  (ECF No. 11-13 at 33.)  The

27  Marsden excerpts do not reflect any desire to testify.  (See id. at 33–38.)  The Court ordered the full
    transcript and confirmed that Petitioner made no such assertion during the Marsden hearing. (ECF No.

28  26.)

**D.   Freestanding Claim of Actual Innocence**

For his sixth claim, Petitioner repeats the same argument regarding his freestanding actual innocence claim from his state court brief without addressing the AEDPA standard of review, which requires him to challenge either the state court's finding of fact or application of federal law as objectively unreasonable.  (<u>Compare</u> ECF No. 11-10 at 20–21 <u>with</u> ECF No. 5 at 35–37.) [6] Petitioner claims that the sworn, post-conviction declarations of his wife and stepson prove that he is actually innocent, which renders the state court's finding objectively unreasonable.  (ECF No. 5 at 37.) Respondent argues that an independent claim of actual innocence is not cognizable because there is no clearly established federal law on the issue for the purposes of an AEDPA analysis.  (ECF No. 11-1 at 21–22.)  Respondent further argues that even if Petitioner's freestanding innocence claim is cognizable, the state court's rejection of it was nevertheless reasonable.  (<u>Id.</u> at 22.)

**1.  State court findings**

On habeas review, the state appellate court rejected Petitioner's freestanding innocence claim as follows:

> The claim of new evidence of innocence fails to state a prima facie case. Habeas corpus relief is available when "[n]ew evidence exists that is credible, material, presented without substantial delay, and of such decisive force and value that it would have more likely than not changed the outcome at trial."  (Pen. Code, § 1473, subd. (b)(3)(A).)  "For purposes of this section, 'new evidence' means evidence that has been discovered after trial, that could not have been discovered prior to trial by the exercise of due diligence, and is admissible and not merely cumulative, corroborative, collateral, or impeaching."  (Id., § 1473, subd. (b)(3)(B).)  The declarations Beason now offers from his wife and stepson to establish an alibi defense do not qualify as "new evidence" for three reasons.

---

[6] There are only two differences between Petitioner's argument before this Court and his argument in state court.  The first is the addition of "THE STATE COURT DECISION WAS OBJECTIVELY UNREASONABLE BECAUSE" to the beginning of the title.  (ECF No. 5 at 35.)  The second is the addition of the sentence "[a]ccordingly, the state court decision was objectively unreasonable and the conviction should be reversed" as the last line of the section.  (<u>Id.</u> at 37 (citations omitted).)

First, the evidence was readily available before trial.  (See Pen. Code, § 1473, subd. (b)(3)(B).)  Beason alleges he told counsel before trial about his alibi that on the day of the robbery he was "zonked out on medication" at home with his wife and stepson, and during trial he complained to the court about counsel's failure to investigate and present the alibi defense.  Second, Beason did not present the declarations "without substantial delay."  (Id., § 1473, subd. (b)(3)(A).)  He did not obtain the declarations until April 16, 2021, and did not present them to the superior court until August 20, 2021, three years after sentencing.  Why it took Beason so long to present to the superior court declarations from members of his own household is not explained.  Third, the alibi evidence is not "credible" and "of such decisive force and value that it would have more likely than not changed the outcome at trial."  (Ibid.)  Beason's wife and stepson have an obvious bias and motive to provide an alibi (Evid. Code, § 780, subd. (f)), and their declarations do not clearly establish an alibi.  The wife stated she saw Beason asleep in their bedroom before she left for work at approximately 5:00 a.m. on the day of the robbery.  The stepson stated his mother later telephoned and asked him to tell Beason to take keys to her at work, the stepson woke Beason up, and Beason left at approximately 6:45 a.m. to deliver the keys.  Neither declaration excludes the possibility that Beason left home after his wife had gone to work; drove to the convenience store, which was about 11 minutes away; committed the robbery; and drove home and went to sleep before his stepson woke him up.  When this weak alibi evidence is compared to the evidence introduced against Beason at trial, including T.T.'s description of the robber, the video surveillance of the robbery, the towel with Beason's DNA found at the crime scene, and the discovery of matching towels in his car and home, it does not appear more likely than not that the jury would have acquitted Beason of robbery had the alibi evidence been introduced at trial.  Habeas corpus relief on the ground of new evidence is therefore not available.

(ECF No. 11-14 at 3–4.)

## 2.  Federal Law

The Supreme Court has "not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence."  McQuiggin v. Perkins, 569 U.S. 383, 392 (2013); see also Dist. Attn'y's Off. for Third Jud. Dist. v. Osborne, 557 U.S. 52, 71 (2009) ("Whether such a federal right [to be released upon proof of actual

innocence] exists is an open question.")  Instead, the Supreme Court has held that a convincing showing of actual innocence can be used to reach the merits of a separate, but otherwise procedurally barred, constitutional claim.  McQuiggin, 569 U.S. at 386; see Gimenez v. Ochoa, 821 F.3d 1136, 1143 (9th Cir. 2016) ("The Supreme Court has never recognized 'actual innocence' as a constitutional error that would provide grounds for relief without an independent constitutional violation.")  In other words, claims of actual innocence are considered "a *gateway* through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits."  Schlup v. Delo, 513 U.S. 298, 315 (1995) (citing Herrera, 506 U.S. at 404) (emphasis added).  The Schlup "gateway" is reserved; however, for the "extraordinary case," where a petitioner can show that a failure to entertain their separate constitutional claim on the merits would result in a "fundamental miscarriage of justice."  Id. at 324.

Strictly for "the sake of argument" and without deciding the viability of such a claim, the Supreme Court has noted that "a truly persuasive demonstration of [freestanding] 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim."  Herrera, 506 U.S. at 417.  Because entertaining freestanding habeas claims of actual innocence would create an "enormous burden [of] having to retry cases based on often stale evidence" that would have a "very disruptive effect" on the courts, the threshold for proving actual innocence is assumed to be "extraordinarily high."  Id.  In a holding that explicitly refuses to resolve the issue of viability, the Supreme Court stated that a freestanding claim of actual innocence would require even more convincing proof than the Schlup "gateway."  House v. Bell, 547 U.S. 518, 554-55 (2006) (though the petitioner casted extreme doubt onto his conviction with new DNA evidence, this doubt was short of a "conclusive exoneration" and insufficient as a freestanding innocence claim).

The Ninth Circuit has also "not resolved whether a freestanding actual innocence claim is cognizable in a federal habeas corpus proceeding in the non-capital context, although [it has] assumed that such a claim is viable." <u>Jones v. Taylor</u>, 763 F.3d 1242, 1246 (9th Cir. 2014); <u>see also</u> <u>Carriger v. Stewart</u>, 132 F.3d 463 (9th Cir. 1997). Operating under this assumption of viability, "the petitioner must 'go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent.'" <u>Jones</u>, 763 F.3d at 1246 (quoting <u>Carriger</u>, 132 F.3d at 476). Put differently, Petitioner must show evidence "that would preclude any possibility of [his] guilt." <u>Carriger</u>, 132 F.3d at 477. This Court has not found any Ninth Circuit precedent that held a freestanding claim of innocence satisfied this high standard. <u>See</u>, <u>e.g.</u>, <u>Prescott v. Santoro</u>, 53 F.4th 470, 482–83 (9th Cir. 2022); <u>Hooper v. Shinn</u>, 56 F.4th 627, 634–35 (9th Cir. 2022); <u>Morris v. Hill</u>, 596 F. App'x 590, 591 (9th Cir. 2015).

### 3. Analysis

Instead of arguing his actual innocence claim under federal law and the AEDPA limitations described above, Petitioner's actual innocence claim is based almost entirely on *state* law and a California statute that permits state courts to grant habeas relief where newly discovered evidence "would have more likely than not changed the outcome at trial." (ECF No. 5 at 36-37 (citing Cal. Pen. Code § 1473).) Petitioner argues actual innocence under this state law standard, without claiming that the declarations he submits in support of his claim affirmatively prove that he is actually innocent, as required by federal law. (<u>Id.</u> at 37) ("Petitioner is entitled to habeas relief under § 1473, subd. (b)(3)(B), because the new evidence of such decisive force and value that it would have more likely than not changed the outcome at trial. . . .")). Although Petitioner cites <u>United States v. Berry</u>, the case does nothing to support his argument. 624 F.3d 1031, 1038, n.5 (9th Cir. 2010) (noting that, although petitioner claimed new evidence "called into doubt the overall weight of the evidence against him," he did not apply the actual innocence standard under federal law).

Regardless of Petitioner's oversight, this Court follows the standard set by the federal courts and considers whether Petitioner's declarations in support of his alibi defense meet the extraordinary burden he faces to show his innocence.  Jones, 763 F.3d at 1246.  In Carriger v. Stewart, the petitioner challenged his state court murder conviction on habeas corpus under the theory of freestanding actual innocence.  Carriger, 132 F.3d at 466.  The Ninth Circuit found that the prosecution's case "relied principally" on the testimony of a co-conspirator known to authorities as a habitual liar who had attempted to frame others for his own crimes multiple times.  Id.  "The physical evidence at trial was not strong" and the co-conspirator later confessed to the murder and admitted that he had framed Carriger during a post-conviction evidentiary hearing.  Id. at 466–68.  The Ninth Circuit found that the petitioner had cast "a vast shadow of doubt over the reliability of his conviction," but refused to grant habeas relief because "the confession by itself [fell] short of affirmatively proving that Carriger more likely than not [was] innocent."  Id. at 477. [7]  The court noted Carriger had not presented evidence "demonstrating he was elsewhere at the time of the murder" or "new and reliable physical evidence" that would affirmatively prove his innocence.  Id.

Unlike the petitioner in Carriger, Petitioner presents evidence to establish an alibi using his own post-conviction sworn declaration and the post-conviction sworn declarations of his wife and stepson to demonstrate that he was at home asleep during the robbery.  (ECF No. 5 at 30–31.)  However, as discussed above, there are significant concerns with the credibility of these post-conviction declarations, which the state court recognized.  (ECF No. 11-14 at 3–4.)  Petitioner does not offer any argument aside from prior attorney error to counter the state court's credibility concerns.  (See ECF No. 5 at

---

[7] Carriger was granted a new trial due to a Brady violation and later accepted a plea deal releasing him on time served.  Jordan M. Barry, Prosecuting the Exonerated: Actual Innocence and the Double Jeopardy Clause, 64 Stan. L. Rev. 535, 585 (2012).

35–37.)  Because Petitioner's declarations are subject to such scrutiny, the Petitioner has not gone "beyond demonstrating doubt about his guilt," and he does not "affirmatively prove that he is probably innocent.'" Jones, 763 F.3d at 1246 (quoting Carriger, 132 F.3d at 476).  Considering the Ninth Circuit held that a credible confession in open court is insufficient to affirmatively prove actual innocence, Petitioner fails to show that the purported new evidence casts as "vast" of a "shadow of doubt" as the petitioner in Carriger, let alone evidence that would "preclude any possibility" of his guilt.  See Carriger, 132 F.3d at 476.  Therefore, the state court's finding was not objectively unreasonable.  Consequently, Petitioner is not entitled to habeas relief on claim six.

**E.    Petitioner's Argument of a Fundamental Miscarriage of Justice Fails to State a Cognizable Claim**

In his fourth claim, Petitioner argues the state court was objectively unreasonable because his convictions constitute a fundamental miscarriage of justice.[8]  (ECF No. 5 at 27–28.)  Though the state appellate court did not explicitly address this claim, (see 11-14), Respondent contends the state habeas decision implicitly rejected Petitioner's miscarriage of justice claim because it rejected Petitioner's IAC and actual innocence claims on their merits.  (ECF No. 11-1 at 14.)  Petitioner relies mostly on California precedent to argue that his other claims should be considered on their merits, and that a failure to do so would constitute a "fundamental miscarriage of justice."  (ECF No. 5 at 27–28.)  However, as discussed supra, Schlup creates a procedural "gateway" to seek habeas relief on separate constitutional grounds, but it does not recognize a "miscarriage of justice" as an independent ground for habeas relief.  Schlup, 513 U.S. at 314–15; see also Murray v. Carrier, 477 U.S. 478, 479–80 (1986) (federal habeas courts

---

[8]  Petitioner asserts a nearly identical argument from his state habeas petition.  (Compare ECF No. 5 at 28 with ECF No. 11-12 at 12.)

1  can consider procedurally defaulted claims when a petitioner demonstrates actual

2  innocence of the substantive offense); accord Dretke v. Haley, 541 U.S. 386, 387 (2004).

3          While the state court of appeal did not expressly address Petitioner's

4  fundamental miscarriage of justice claim, it considered and rejected Petitioner's IAC and

5  actual innocence claims on their merits.  (ECF No. 11-14.)  A failure to entertain certain

6  constitutional claims due to procedural default that results in a "fundamental

7  miscarriage of justice" merely allows federal courts to consider other constitutional

8  claims, but it is not an independent claim for overturning a conviction.  Schlup, 513 U.S.

9  at 314–15.  Therefore, by pleading that his conviction should be overturned solely based

10  on a fundamental miscarriage of justice, Petitioner fails to state a cognizable claim on

11  which habeas relief can be granted.  See, e.g., id.; House, 547 U.S. at 536–37;

12  McQuiggin, 569 U.S. at 392.  Additionally, if Petitioner's intention is to argue that a

13  fundamental miscarriage of justice will occur if this Court does not entertain evidentiary

14  arguments that were not raised on his state habeas petitions, the issue is moot as the

15  evidentiary arguments are addressed supra.  Thus, Petitioner is not entitled to relief on

16  this claim.

17          Accordingly, the California Court of Appeal's denial of the Petitioner's

18  fundamental miscarriage of justice claim was neither contrary to, nor an unreasonable

19  application of, clearly established federal law.  See 28 U.S.C. § 2254(d)(1).  Further,

20  based on review of the entire record, the state court's decision was not based on an

21  unreasonable determination of the facts in light of the evidence presented at the state

22  court proceeding.  See 28 U.S.C. § 2254(d)(2).

23                          **IV.  CONCLUSION AND RECOMMENDATION**

24          For all the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the District

25  Judge issue an Order: (1) approving and adopting this Report and Recommendation, and

26  (2) directing that Judgment be entered **DENYING** the Petition.

27  //

28

21cv2052-GPC (MSB)

**IT IS HEREBY ORDERED** that no later than **June 20, 2024**, any party to this action may file written objections with this Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **July 18, 2024**.  The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.  See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998).

**IT IS SO ORDERED.**

Dated:  May 23, 2024

Honorable Michael S. Berg
United States Magistrate Judge

21cv2052-GPC (MSB)